SHEA, Respondent, v. GRAFE, and another, d/b/a Northside Sales, Appellants.

Supreme Court

*No. 76–258.  Argued February 26, 1979.—Decided April 10, 1979.*
(Also reported in 274 N.W.2d 670.)

For the appellants there were briefs by *Hale, Skemp, Hanson, Schnurrer & Skemp,* and oral argument by *William A. Kirkpatrick,* all of La Crosse.

For the respondent there was a brief by *John L. Perlich* and *Johns, Flaherty & Gillette, S. C.*, of La Crosse, and oral argument by *Mr. Perlich.*

WILLIAM G. CALLOW, J.   The plaintiff was awarded damages based on the trial court's determination that the defendants violated various provisions of the Wisconsin Consumer Act in their sale of a motor home to the plaintiff.   The defendants concede noncompliance with the terms of the Act; they challenge on appeal the application of the Act to these facts and computation of damages.   We hold that the imposition of Consumer Act penalties was improper because the underlying contract was tainted with illegality in the parties' insertion in the contract of an inflated down payment and purchase price figures which were designed to facilitate financing by a third-party lending institution.

The defendants Grafe and Malizia formed a partnership known as Northside Sales through which they sold motor homes.   The business was located in Spring Valley, Minnesota.   On May 4, 5, and 6, 1973, the defendants exhibited three motor homes at a home show in Wisconsin Dells, Wisconsin.   The plaintiff, a regional sales manager for Trojan Seed Company was also an exhibitor at the show.

The plaintiff became interested in the purchase of one of the defendants' motor homes.   After rejecting the plaintiff's proposed trade of his warehouse for one of the homes, the defendants told him they would sell one of the homes for $19,000.   On May 12, the plaintiff went to the defendants' place of business in Spring Valley.   The parties executed a printed-form contract for the sale of a motor home.   The contract showed a purchase price of $21,000, with a down payment of $3,000.   Those were not the correct figures.   In order to facilitate financing by showing a greater equity in the purchaser,

these inflated figures were used. The actual selling price was $19,000, with a $1,000 down payment. The motor home retail installment contract indicated it was drafted pursuant to the requirement of the Federal Truth in Lending Act and the Minnesota Motor Vehicle Retail Installment Sales Act. The document contained language that the buyer acknowledged notice of intended assignment of the contract to a bank. The sellers told the buyer they did not know if they could get financing, but they would put through the buyer's credit application along with the contract.

A few days later the defendants called the plaintiff and told him that the financing agency, Consolidated Acceptance Corporation, which seeks to assign the contract to a bank near a buyer's home, said there would have to be an additional $1,500 down payment to accomplish financing.[1] Grafe testified that the plaintiff agreed to pay another $1,500 in order to have delivery of the motor home, and the defendants arranged to deliver the motor home May 18. A new contract was drawn on a printed form identical to the first except that it showed a sale price of $21,000, with a down payment of $4,500. The buyer gave the sellers two postdated checks, one for $500 and another for $1,000, executed the contract, and took delivery at Twin Bluffs, Wisconsin. Neither of the checks were honored by the bank because the $500 check was drawn on an account containing insufficient funds, and the other was drawn on an account which had been closed.

The buyer had difficulties with the water system and took the motor home to the Winona, Minnesota, plant for repairs. The repairs did not solve the problem. The

[1] Financing was accomplished by the defendants assigning the contract to the Batavian National Bank (formerly The National Bank of Wisconsin), and the settlement negotiated by the parties resulted in the bank obligation being satisfied by the defendants.

buyer called the sellers and told them he was thoroughly disgusted with the motor home, and the sellers could take it back if they wished.

Through their attorneys, the parties negotiated a settlement. The defendants gave the plaintiff a check for $1,703, the amount he had paid less an allowance of $100 for a scratch in the body of the motor home. The plaintiff returned the home to the defendants January 11, 1974. By the terms of a written release executed in exchange for the check, the plaintiff warranted that except for the scratch the home was "in first-class order and repair and in running condition and free from any worn, broken or defective parts." When the defendants returned the home to Spring Valley, they found that various components of the water system had frozen and burst.

Repair of the water system cost $495.02; repair of the scratch in the body cost $506.

When the defendant discovered the damage to the water system, they stopped payment on the $1,703 check to the plaintiff. The defendants re-sold the motor home in June, 1975, eighteen months after they recovered it from the plaintiff, for $18,900, $15,150 in cash and an allowance of $3,750 for a trade-in car. The defendants later re-sold the car for $3,100. During the eighteen months the defendants held the motor home, they were required to pay interest on money borrowed to discharge the indebtedness to the institution financing the original purchase.

The plaintiff brought an action against the defendants alleging, among other things, that the purchase contract violated the Wisconsin Consumer Act, Chapter 421, Stats., et seq., in several respects. The defendants counterclaimed, seeking damages for the cost of repairing the motor home and its depreciation.

At the conclusion of the trial, the court issued these findings, among others, from the bench:

(1) "[T]he overwhelming predominant use of this motor home would be for personal-recreational purposes, and . . . although there would have been some incidental business use . . . it would not be sufficient to change its character."

(2) The plaintiff voluntarily surrendered the home to the defendants following an agreement for rescission of the contract, but the rescission agreement "fell because of the failure of consideration when the payment on the check was stopped."

(3) The sales contract violated the Wisconsin Consumer Act in the following respects:

(a) The contract provided for a delinquency charge of $5 or 5 percent of an installment, in excess of the $3/3 percent maximum allowed under sec. 422.203, Stats.;

(b) The contract provided for a prepayment charge of $15 in violation of secs. 422.208–.209, Stats.;

(c) The contract failed to comply with the form requirements of sec. 422.303, Stats.;

(d) The contract imposed payment of attorney fees on the customer in violation of sec. 422.411(1), Stats.;

(e) The contractual default charges were in excess of reasonable expenses in violation of sec. 422.413, Stats.

(4) The violations of the Act were intentional and not excused under sec. 425.301(3), Stats.

(5) The plaintiff exercised good faith at all times; the defendants exercised bad faith from the time they took possession of the home and stopped payments on the check.

The court concluded that under the terms of the Consumer Act the plaintiff was entitled to a judgment of $5,000 in penalties, plus attorney fees and disbursements. The court awarded the defendants an offsetting judgment on their counterclaim in the amount of $1,101, reflecting the cost of the repairs and the $100 difference between the sale price of the home to the plaintiff and the price received on resale. The court amended its findings and conclusions to allow recovery for interest on the money to finance the home for eight months, a period the court considered a reasonable time to dispose

of the home. The resulting order for judgment awarded the plaintiff $4, 417.39.

The defendants appeal from the judgment. The plaintiff seeks review of the trial court's determination that he voluntarily surrendered the motor home and thus is not entitled to recover a penalty against the defendants under sec. 425.206, Stats. Plaintiff also asks review of the award of interest paid over a period of eight months.

We address none of the issues raised by the parties. We requested supplemental briefing on the question whether the insertion of inflated down payment and purchase price figures rendered the contract illegal, and if so, what effect such illegality would have on this action to recover penalties under the Consumer Act. The parties agree that the inflated figures should have no effect on the disposition of this appeal. We disagree.

An agreement which "contemplates or necessarily involves the defrauding or victimizing of third persons as its ultimate result" is void as against public policy. *Twentieth Century Co. v. Quilling*, 130 Wis. 318, 324–25, 110 N.W. 174 (1907). *Accord: Rietbrock v. Studds*, 262 Wis. 5, 53 N.W.2d 712, 54 N.W.2d 899 (1952) ; *Farmers & Merchants State Bank v. Perry*, 186 Wis. 93, 202 N.W. 179 (1925) ; Restatement of *Contracts*, sec. 577 (1932). Insofar as the inflated contract figures were designed to induce the lending institution to finance the transaction, the contract contemplated misleading the institution and therefore is tainted with illegality. *Cf.: Farmers & Merchants State Bank, supra* at 98.

Responsible financing is a vital part of a healthy economy and is essential to commerce. Lending institutions must be able to rely on the integrity of the representations of those who seek financing. Public policy, therefore, demands that courts decline to enforce a con-

tract or grant relief based on a contract upon the application of either of the conspiring parties unless failure to enforce or grant the relief sought would create a greater injustice than that sought to be avoided by nonenforcement.

In *Schara v. Thiede*, 58 Wis.2d 489, 206 N.W.2d 129 (1973), plaintiff leased a tavern from defendant pursuant to a "management agreement." Defendant retained the liquor license. In fact, the parties intended that plaintiff would operate the tavern as his own. This court reversed plaintiff's judgment for breach of contract, holding that the agreement was not enforceable because it had "as its purpose the concealment from the public and the licensing authority of the identity of the true operator of an establishment for the sale of liquor." *Id.* at 496.

Here the plaintiff complains that the financing terms of the transaction violated provisions in the Consumer Act. Thus the inflated figures are central to this case. Four of the five violations found by the trial court involved financing terms: delinquency charge, prepayment charge, provision for payment of attorney fees for collection, and default charges. The fifth, failure to comply with form requirements, is indirectly related to the financing terms. Therefore, the action concerns the figures as represented to the financing institution.

We recognize the parties have not pleaded illegality of the contract, and the trial court did not raise the issue. We sua sponte consider the issue of illegality. Restatement of *Contracts*, sec. 600, Comment *a* (1932), notes:

"Illegality, if of a serious nature, need not be pleaded. If it appears in evidence the court of its own motion will deny relief to the plaintiff. The defendant cannot waive the defense if he wishes to do so. Indeed, if the court

suspects illegality, it may examine witnesses and develop facts not brought out by the parties, and thereby establish illegality that precludes recovery by the plaintiff."

We consider this illegality to be of a serious nature. The illegality appeared in the face of the contract, in the evidence, and by the admissions of the parties.

Since the penalties awarded under the Wisconsin Consumer Act resulted from a finding that the contract provisions violated the Wisconsin Consumer Act and since we conclude the contract was void ab initio because it was contrary to public policy, we are obliged to return the parties to the position in which we found them.

*By the Court.*—Judgment reversed and cause remanded with directions to dismiss the action and counterclaim without costs.