Holly FALIK, Plaintiff,

v.

**THE PENN MUTUAL LIFE INS. CO., Defendant.**

No. 00–CV–1336.

United States District Court, E.D. Wisconsin.

March 7, 2002.

---

Jordan M. Lewis, Siegel, Brill, Greupner, Duffy & Foster, Milwaukee, WI, for Plaintiff.

Paul E. Benson, James Patrick Thomas, Matthew S. MacLean, Michael Best & Friedrich, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

RANDA, District Judge.

Plaintiff Holly Falik, M.D. ("Dr.Falik") brought suit against defendant Penn Mutual Life Ins. Co. ("Penn Mutual") for breach of contract, bad faith, and breach of fiduciary duty arising out of Penn Mutual's decision to discontinue payment of long-term disability benefits. Penn Mutual has moved for summary judgment. For the

reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

Dr. Falik previously worked as a pediatric physician in New York City. Plaintiff's Proposed Findings of Fact ("PFOF"), ¶ 2; Defendant's Proposed Findings of Fact ("DFOF"), ¶ 12. On November 13, 1996, while visiting her husband in California (he was seeking a transfer to New York), Dr. Falik was injured in an automobile accident. DFOF, ¶ 13. Dr. Falik suffered a partially collapsed lung, sprain/strain of the neck and spine, bruising of the chest and sternum, and ulnar neuritis. DFOF, ¶¶ 14, 16. Dr. Falik filed a claim under her disability insurance policy with Penn Mutual. DFOF, ¶¶ 7, 16. At the time she filed for benefits, Dr. Falik's treating physician estimated that Dr. Falik would be able to work again beginning February 27, 1997. DFOF, ¶ 17.

As part of its benefits-related process, Penn Mutual sent a representative to California to meet with Dr. Falik in January 1997. The claims representative interviewed Dr. Falik and asked her for a description of the activities that, due to the accident, she was no longer able to perform. DFOF, ¶ 19. The claims representative recommended surveillance of Dr. Falik, as well as an independent medical examination by a specialist. DFOF, ¶ 21. Also as part of its benefits-related process, a physician employed by a subsidiary of Penn Mutual, Dr. Betjemann, telephoned Dr. Falik's physician to inquire as to her status and when she would return to work. DFOF, ¶ 25. On March 7, 1997, Dr. Falik's physician sent Penn Mutual a letter stating that Dr. Falik would be "temporarily totally disabled" for another four to eight weeks, although he subsequently signed a letter from Dr. Betjmann that stated Dr. Falik's symptoms had improved. DFOF, ¶ 26.

After receiving the signed letter from Dr. Falik's physician, Penn Mutual forwarded a letter to Dr. Falik along with a check for $12,982.80. The letter stated that there were insufficient limitations or restrictions caused by Dr. Falik's injuries that would prevent her from returning to work full-time as a pediatrician, and that as such Penn Mutual was closing her claim and returning her policy on a premium basis. DFOF, ¶ 28.

After Dr. Falik called Penn Mutual to complain about this finding, DFOF, ¶ 29, and after Dr. Falik's treating physician sent another letter to Penn Mutual stating that Dr. Falik was disabled for another 4 weeks, DFOF, ¶ 30, Dr. Falik underwent an independent medical examination by Dr. Silver. DFOF ¶ 31. Dr. Silver found that "there do appear to be objective findings in the physical examination to support [Dr. Falik's] subjective complaints," and that "Dr. Falik is unable to do the substantial and material duties of her regular occupation in the usual and customary way." See March 26, 1997 Silver Let. at 2. Dr. Silver also found that if Dr. Falik continued to improve, she would be considered partially disabled by May 15, 1997, with an ability to perform some but not all of her duties. DFOF, ¶ 31.

On April 17, 1997, Dr. Falik carried out, at Penn Mutual's behest, a KEY functionality assessment. The physical therapist who conducted the assessment concluded that Dr. Falik could only engage in weighted activities under 4 pounds, and that "she may not be able to perform the Physical demand outlined in her job description." See April 17, 1997 Yamamoto Let. During the month of April, 1997, Penn Mutual carried out surveillance on Dr. Falik on multiple days. DFOF, ¶ 37. Penn Mutual also hired a counseling service to carry out a job analysis of the demand upon Dr. Falik, although that analysis was done

without any input on Dr. Falik's actual job duties. DFOF, ¶ 34. Based upon the KEY assessment and the job assessment, Dr. Betjmann concluded that Dr. Falik was ready to return to work part if not full time, and that although she had problems with lifting objects over 4 pounds, "with high motivation that obstacle could be overcome." DFOF, ¶ 38.

On May 12, 1997, Dr. Falik returned to work part-time, with a staff nurse assisting her with activities that she could not perform in the clinical setting. According to the assisting nurse, Dr. Falik was unable to do a number of activities required by her job, including: (1) using an otoscope for examinations (she would groan in pain when she had to lift her arms high enough to look in patients ears); (2) throat cultures; (3) examining patients for stiff necks; (3) moving and positioning patients; (4) vaccinations; (5) and using a nebulizer. Dr. Falik also had to take breaks from work due to severe pain, and was found by staff on at least two occasions crying from the pain. *See* Oct. 27, 1997 Lopez Let., at 1–2. Because she had returned to work, Penn Mutual discontinued total disability payments, and it is undisputed that Dr. Falik has been paid total disability benefits through May 12, 1997. DFOF, ¶ 41; *see generally*, PFOF.

On July 1, 1997, Dr. Falik resigned from her pediatric position, effective July 2, 1997. *See* July 27, 1997 Sykes. Let. Dr. Falik subsequently requested continuation of her total disability benefits from Penn Mutual. Penn Mutual refused, and Dr. Falik eventually filed suit in state court. The matter was removed to this Court on the basis of diversity jurisdiction, 28 U.S.C. § 1332.

## ANALYSIS

Penn Mutual argues the following: (1) the breach of contract claim is barred by the contractually-created statute of limita-

tions; (2) alternatively, the breach of contract claim must be dismissed because Dr. Falik does not meet the definition of total disability under the policy; and (3) the bad faith and breach of fiduciary duty claims are time-barred under Wis. Stat. § 893.57. After outlining the relevant policy provisions, each argument is discussed separately below.

### I. The Policy

Three policy provisions will require special consideration: the proof of loss provision, the contractual limitation on bringing a cause of action, and the definitions of total and residual disability.

The proof of loss provision provides:

*Proof of loss* You must give written proof of loss within 90 days after:

- each total or residual disability period for which we are liable; or

- the occurrence of any other loss for which you are covered.

If you fail to give proof within this time because it is not reasonably possible, we will not reduce or deny your claim. But you must give proof of loss as soon as it is reasonably possible to do so. And you must give this proof within one year after the time limit unless you are legally unable to do so.

*See* Policy, § 6 (emphasis in original).

The contractually-created statute of limitations provides:

*Legal Actions* You cannot start any legal action against us for benefits until 60 days after you give required proof of loss. See *Proofs of Loss* in this Section. You also cannot start any legal action more than 3 years after the time limit for giving proof of loss.

*See* Policy, § 6 (emphasis in original).

The policy defines total disability as follows:

*Total Disability Defined* You will be considered *totally disabled* if all of these conditions are met:

- You are unable to do the substantial and material duties of your regular occupation. Your *regular occupation* is your usual work when total disability starts. If you are retired and not working when total disability starts, your regular occupation will be the normal activities of a retired person of like age and sex.
- Your total disability starts while this policy is in force.
- Your total disability results from sickness or injury.
- You are under a doctor's care. *Doctor* means a licensed physician other than yourself.

*See* Policy, § 2 (emphasis in original).

Finally, the policy defines residual disability as follows:

*Residual Disability Defined* You will be considered *residually disabled* if all these conditions are met:

- You are able to do some but not all of the substantial and material duties of your regular occupation, or you are able to do all of the substantial and material duties of your regular occupation but for less than full time.
- You are working, and your earnings during a month do not exceed 80% of your pre-disability earnings.
- Your residual disability results from sickness or injury.
- You are under a doctor's care.

*See* Policy, § 2 (emphasis in original).

## A. *Three Year Statute of Limitations on Contract Claim*

Penn Mutual argues that Dr. Falik's breach of contract claims are time-barred.

1. Dr. Falik filed suit on September 8, 2000.

2. However, Dr. Falik's brief return to work from May 12, 1997 until July 1, 1997 may

Although Wisconsin's statute of limitations for breach of contract is six years, as outlined above, Dr. Falik's policy provides that the insured "cannot start any legal action more than 3 years after the time limit for *giving proof of loss."* Policy, § 6 (emphasis added). Correspondingly, the policy provides the time limit for giving proof of loss: "You must give us written proof of loss within 90 days after: [1] *each total or residual disability period for which we are liable;* or [2] the occurrence of any other loss for which you are covered." Policy, § 6 (emphasis added).

■ The parties contest the meaning of the phrase "each total or residual disability period for which" Penn Mutual is liable. Because it made monthly payments, and because Dr. Falik apparently submitted proof of loss on a monthly basis, *see* Second Dec. of William J. Hughes, ¶¶ 8–11, Penn Mutual's interpretation of the policy is that every month is considered a "disability period for which" it is liable. Accordingly, Penn Mutual argues the following: (1) the proof of loss provision was triggered on May 12, 1997, the last date for which Dr. Falik was paid disability benefits; (2) Dr. Falik had 90 days from that date to provide proof of loss (*i.e.,* until August 10, 1997); and (3) Dr. Falik had three years after that date (until August 10, 2000) to file a lawsuit. Because she failed to file suit by August 10, 2000,[1] Penn Mutual argues that Dr. Falik's claims are time-barred.

On the other hand, Dr. Falik argues that the phrase "each total or residual disability period" refers to the entire period of time for which Penn Mutual is liable to her under the policy. Accordingly, because Dr. Falik continues to suffer from total disability,[2] the 90–day proof of loss provi-

constitute a "break" in terms of her being continually and totally disabled since her accident.

sion has not yet been triggered. Indeed, assuming that Dr. Falik remains disabled under the terms of the policy, it will not be triggered until she reaches age 65 in the year 2014, a result that Penn Mutual insists is absurd.[3] *See* Policy Schedule, p. 1 (Maximum Benefit Period).

While this result may appear absurd, two factors support the finding that as written, the 90–day period for providing proof of loss under Penn Mutual's policy has not yet been triggered, and as such, Dr. Falik's contract claim is not time-barred. First, the overwhelming majority of courts analyzing functionally identical language have come to the same conclusion as Dr. Falik, including a half-dozen other federal courts and a brace of state appellate courts. See *Meltzer v. Mutual Benefit Health & Accident Ass'n*, 150 F.Supp. 300, 301 (E.D.Pa.1957) (stating that as the policy contains no limitation of the period during which the defendant is liable for monthly payments for total disability, the "termination of the period for which the Association is liable" has not arrived, and neither the time for furnishing loss, nor the time for the limitation of action clause had begun to run); *Liberto v. Mutual Benefit Health & Accident Ass'n*, 323 F.Supp. 1274, 1276 (W.D.Pa.1971) (where total disability is ongoing, "the insurer is liable to pay the totally and permanently disabled insured 'so long as the insured lives'" and as such three-year period had not yet run); *Oglesby v. Penn Mutual Life Ins. Co.*, 877 F.Supp. 872, 885 (noting that this interpretation is most "natural" interpretation of the clause); *Sebastian v. Provident Life & Accident Ins. Co.*, 73 F.Supp.2d 521, 534–535 (D.Md. 1999) (stating that proposed construction not contrary to the plain and unambiguous language of the proof of loss provision, and that "as a matter of law, a continuous

period of disability constitutes a single "period for which [a disability insurer] is liable); *Clark v. Mass. Mutual Life Ins. Co.*, 749 F.2d 504, 507 (8th Cir.1984) (finding that proof of loss not a condition precedent to liability under the policy, and that 90 day period had not run); *Hofkin v. Provident Life & Accident Ins. Co.*, 81 F.3d 365, 374 (3rd Cir.1996) (collecting cases holding same). See also *Wall v. Pennsylvania Life Ins. Co.*, 274 N.W.2d 208, 213–214 (N.D.1979) (period for which insurer liable is total period of disability); *Goodwin v. Nationwide Ins. Co.*, 104 Idaho 74, 656 P.2d 135, 143–44 (Ct.App.1982) (holding same); *Laidlaw v. Commercial Ins. Co.*, 255 N.W.2d 807, 811 (Minn.1977) (most natural reading); *Ryan v. ITT Life Ins. Corp.*, 450 N.W.2d 126, 129 (Minn.1990) (holding that issue is the existence and continuity of total disability); *Turner v. Mutual Benefit Health & Accident Ass'n*, 5 Misc.2d 524, 160 N.Y.S.2d 883, 890 (Sup. Ct. Oneida Cty, 1957) (aff'd, 5 A.D.2d 951, 172 N.Y.S.2d 571 (1958)); *Continential Casualty Co. v. Freeman*, 481 S.W.2d 309 (Ky.1972) (holding similar clause not ambiguous). But see *Nikaido v. Centennial Life Ins. Co.*, 42 F.3d 557 (9th Cir.1994) (reading a monthly limitation into the provisions); *Goff v. Aetna Life & Casualty Co.*, 1 Kan.App.2d 171, 563 P.2d 1073, 1077 (1977) (basing a similar holding to that of the Ninth Circuit on a finding that payments are due monthly).

Second, the Court finds that the policy language is ambiguous. As described above, the phrase "each total or residual disability period for which" Penn Mutual is liable is reasonably susceptible to two different interpretations. The policy does not separately and explicitly define the meaning of this phrase. Accordingly, Wisconsin's laws of construction with re-

---

**3.** Penn Mutual notes the attendant absurdity: Dr. Falik would be able to file suit until some-

time in 2017, no matter when the alleged breach occurred.

spect to insurance contracts mandate that the Court find in favor of the insured, Dr. Falik:

> The rules for interpreting insurance contracts are well-established: 'Insurance contracts are controlled by the same rules of construction as are applied to other contracts. Ambiguities in coverage are to be construed in favor of coverage, while exclusions are narrowly construed against the insurer. Words or phrases are ambiguous when they are reasonably susceptible to more than one reasonable construction.'

*Dowhower ex rel. Rosenberg v. West Bend Mut. Ins. Co.*, 236 Wis.2d 113, 129, 613 N.W.2d 557, 565 (2000) (internal citations omitted). Under Wisconsin law, this is known as the doctrine of *contra preferentum*, a doctrine founded in public policy. Where an ambiguous exclusion relates directly to liability coverage, "it is resolved in favor of liability coverage.... The policyholder is the 'reasonable insured' from whose perspective we interpret the policy. The policyholder purchases liability coverage ... and would read ambiguities in that coverage to afford greater liability coverage, not less." *Ennis v. Western Nat. Mut. Ins. Co.*, 225 Wis.2d 824, 834, 593 N.W.2d 890, 894 (Wis.Ct.App.) *review denied*, 228 Wis.2d 168, 599 N.W.2d 409 (Wis. 1999). If Penn Mutual wanted the policy interpreted in a certain way, it could have drafted the policy to achieve the desired result. Since 1957, courts have been interpreting almost identical language in this fashion, and Penn Mutual should have recognized this. Under Wisconsin law it is not the role of the courts to rewrite contracts for the parties. See *Hortman v. Otis Erecting Co.*, 108 Wis.2d 456, 322 N.W.2d 482, 484–485 (Ct.App.1982). The Court therefore finds that the period for filing proof of loss has not yet been triggered, the statute of limitations under the contract has not run, and Dr. Falik's breach of contract claims are not time-barred. Penn Mutual's motion for summary judgment based upon the contractual statute of limitations is denied.

### B. *Penn Mutual's Lack of Total Disability Argument*

■ Penn Mutual also argues that, based on the interplay between the total and residual disability definitions in Dr. Falik's policy, she cannot qualify for total disability, and accordingly, Penn Mutual is not in breach for failure to advance these payments. Total disability is defined, in part, as the inability "to do the substantial and material duties of your regular occupation," while residual disability is defined, in part, as the ability "to do some but not all of the substantial and material duties of your regular occupation" or, alternatively, as the ability to "do all of the substantial and material duties of your occupation but for less than full-time." Since Dr. Falik *admits* in her submissions to the Court that she can do *some but not all* of the substantial and material duties of her regular occupation, *see* DFOF, ¶ 47; *see generally* PFOF, Penn Mutual argues that she simply cannot be considered *totally* disabled. Indeed, to hold otherwise would render the residual disability provision meaningless.

Penn Mutual cites *Dym v. Provident Life and Accident Ins. Co.*, 19 F.Supp.2d 1147 (S.D.Cal.1998) in support of this argument. The court in *Dym* analyzed the interplay between similar total and residual disability provisions. The policy in that case defined total disability as the inability to "perform the substantial and material duties of your occupation," while residual disability was defined as the inability to "do one or more of your substantial and material daily business duties." The court held that the plaintiff's ability to perform *one* of the substantial and material duties of his occupation *precluded* a finding of total disability:

A comparison of the two definitions suggests that the phrase 'you are not able to perform the substantial and material duties of your occupation' as used in the 'total disability' definition cannot reasonably be read as 'you are not able to perform one or more of the substantial and material duties of your occupation,' because if such a reading was intended, the language 'one or more' would have been used, as it is in the 'residual disability' definition.

*Dym,* 19 F.Supp.2d at 1150. However, this argument ignores *this* policy's entire definition of residual disability. As noted above, to qualify for residual disability benefits, the insured must be "working" and earning a salary which does "not exceed 80% of your pre-disability earnings."[4] The policy in *Dym* did not have such a provision. Also in support, Penn Mutual argues that "[t]he residual provision is an extra benefit [Dr. Falik] paid for so she would have a financial safety net in the event she suffered from a disability that decreased her income but did not render her totally disabled under the definition in the Policy." Brief in Support, p. 26. However, unlike the policy in *Dym,* the residual disability "safety net" in Dr. Falik's policy would only be deployed if and when Dr. Falik returns to work. Therefore, even though Dr. Falik admits that she can perform some of the substantial duties of her previous occupation, she is not as a matter of law precluded from eligibility for total disability benefits.

■ Penn Mutual also offers: (1) the declaration of the claims representative that surveillance tapes show Dr. Falik is able to swim and also to take her dog for walks; (2) evidence that Dr. Falik has taken a number of vacations since her accident; and (3) evidence that Dr. Falik is able to play the keyboard. These facts regarding Dr. Falik's exercise regimen and travels are not significant proof of her ability to perform the substantial duties of her occupation. At most, when compared to the opinions of Penn Mutual's own experts that Dr. Falik was in fact totally disabled, *see* March 26, 1997 Silver Let. at 2; April 17, 1997 Yamamoto Let., these facts show that there is a genuine issue of material fact on the matter.

Finally, again under Wisconsin's doctrine of *contra preferentum,* where ambiguities exist with regard to the meaning of language such as the "substantial and material duties" of Dr. Falik's occupation as a pediatrician, the language is interpreted in favor of the insured. Penn Mutual could have but did not draft the policy in the way that it now asks the Court to interpret it.

## C. *Statute of Limitations on Bad Faith and Breach of Fiduciary Duty Actions*

■ Penn Mutual asserts that Dr. Falik's bad faith and breach of fiduciary duty causes of action are time-barred under Wis. Stat. § 893.57, which imposes a two-year statute of limitations on intentional torts. In response, Dr. Falik argues that the contractually-created statute of limitations functions not just to limit Dr. Falik's right to bring suit, but also as a waiver which would extend Penn Mutual's liability to suit for up to three years.

■ It is true that "affirmative defenses, including statutes of limitations, can be waived if they are not pleaded," and that "[i]t would be anomalous to say that [a statute of limitations], which can be waived by silence and inaction, cannot be

---

4. While the other residual disability benefits appear to be met (insured under a doctor's care, injury results from sickness or injury), after her brief return to work, Dr. Falik resigned effective July 2, 1997, and apparently has not returned.

waived by agreement unless the parties use the most explicit words imaginable." *Cooper Power Sys. v. Union Carbide Chems. & Plastics Co.,* 123 F.3d 675, 683 (7th Cir.1997). However, the majority of states that have considered the question have disfavored waivers of statutes of limitations. See, *e.g., John J. Kassner & Co. v. New York,* 46 N.Y.2d 544, 415 N.Y.S.2d 785, 389 N.E.2d 99(N.Y.Ct.App.1979); *Shaw v. Aetna Life Ins. Co.,* 395 A.2d 384, 387 (Del.Super.Ct.1978). *Cooper Power* involved a limited exception to this rule, that a court may find a waiver in a contract entered into after a cause of action has accrued, but not in a contract entered into before such an event. See also *Kassner & Co.,* 415 N.Y.S.2d 785, 389 N.E.2d at 103–104. The contractual statute of limitations was entered into at the inception of the contract. As such, it does not constitute a valid waiver of the statute of limitations for the bad faith and breach of fiduciary duty claims, and Penn Mutual's motion to dismiss those claims shall be granted.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1. Penn Mutual's motion for summary judgment is GRANTED with respect to plaintiff's claims for bad faith and breach of fiduciary duty; and

2. Penn Mutual's motion for summary judgment is DENIED in all other respects.

SO ORDERED,